O

UNITED STATES DISTRICT COURT

CENTRAL DISTRICT OF CALIFORNIA

TRACY CARTER et al.,              )   Case No. CV 09-07656 DDP (OPx)
                                  )
                Plaintiff,        )
                                  )   **ORDER GRANTING PLAINTIFFS' MOTION**
        v.                        )   **FOR SUMMARY JUDGMENT IN PART AND**
                                  )   **DENYING MOTION IN PART; AND**
COUNTY OF LOS ANGELES et          )   **DENYING DEFENDANTS' MOTION FOR**
al.,                              )   **SUMMARY JUDGMENT**
                                  )
                Defendants.       )
                                  )   [Motions filed on November 22,
                                  )   2010]
_____  )

    This matter comes before the court on the County of Los
Angeles and the Department of Public Work's (collectively
"Defendants'") motion for summary judgment and Tracy Carter, Enma
DeLeon, Jackie Gentry, Grace Leriget, Glenda Medlock, Miriam
Mendoza, Nicole Mercier, Michelle Minjarez, Pablo Sanchez, (the
"Carter Plaintiffs") and Amber Richards and John Lopez (the
"Richards Plaintiffs") cross motions for summary judgment.

    After reviewing the materials submitted by the parties,
considering the arguments therein, and hearing oral argument, the
court GRANTS the Carter and Richards Plaintiffs' motions for

1  summary judgment in part and DENIES them in part; the court DENIES

2  Defendants' motion for summary judgment.

3  **I.    BACKGROUND**

4       The Carter Plaintiffs and Amber Richards are dispatchers who

5  work for the County of Los Angeles Department of Public Works

6  ("DPW").

7       In August 2008, Angelica Cobian of the DPW's Internal Audit

8  Division received an anonymous complaint alleging possible employee

9  misconduct by government employee Richards. (Carter Pl's Statement

10 of Uncontroverted Facts ("SUF") ¶ 67.) The complaint alleged that,

11 among other misconduct, Richards had engaged in sexual activity

12 with a visitor in the dispatch room while she was on duty at night.

13 (Id. ¶ 68.)

14      Richards's supervisor, DWP Assistant Director Chuck Adams,

15 considered the allegation of misconduct to be credible. (Adams Dep.

16 86: 6-13; Celles Dep. 39:18-40:22.) Adams, however, did not

17 interview potential witnesses because, he stated, he worried that

18 word of the investigation would spread thereby compromising the

19 investigation. (Adams Dep. 118:13-18.) In September 2008, Adams

20 installed a hidden camera inside of a fake smoke detector in the

21 dispatch room. (Id. 93: 2-8.) Adams received the DWP Director's

22 approval to do so. (Carter Pl's Statement of Genuine Issues("SGI")

23 ¶ 16.) Adams assigned Rhea Celles of Internal Audit to review the

24 video tapes for any inappropriate conduct. (Cholakian Dep.

25 93:15-20; Adams Dep. 93:2-8; 139:7-14.) Although it was possible to

26 program the camera to record for limited intervals — for example,

27 during Richards's shifts — no attempt was made to restrict the

28 covert videotaping. (Cholakian Dep. 138:12-145:1.)

1    Surveillance began on October 8, 2008. (Carter Pl's SGI ¶ 75.)
2    Adams directed Cholakian to set the camera to record continuously,
3    which it did, until it was discovered on December 10, 2008.
4    (Cholakian Dep. 74:1-4; Celles Dep. 57:20-58:10.) According to
5    Celles, the objective of the investigation was to ascertain whether
6    Richards was in fact engaging in the alleged misconduct, and thus
7    she would typically only view the portions of the tape where
8    Richards worked alone and fast-forward the rest. (Celles Dep.
9    70:3-19.) Ultimately, Celles discovered several acts of
10   inappropriate employee conduct by Richards, including inappropriate
11   touching with visitors. (Carter Pl's SGI ¶ 18.)
12       However, Jeanine Thomas, the Head Departmental Civil Service
13   Representative in the Human Resource Division of the DPW,
14   instructed Celles to check if there were any other violations of
15   policy by other staff. (Thomas Dep. 33:1-23.) Celles admits to
16   watching other employees on the tape. (Celles Dep. 198:19-199:2.)
17       Plaintiffs each declared that they worked in the dispatch room
18   and believed the dispatch room was private. (<u>See, e.g.</u>, Carter
19   Decl. ¶ 2; De Leon Decl. ¶ 2; Gentry Decl. ¶ 2.) The dispatch room
20   is a secured space separated by restricted access. (Cholakian Dep.
21   64:17-65:4, 66:18-21.) It is located on the second floor of the
22   DPW's headquarters building, with a window that is generally
23   covered and, even if it were not covered, is too high up for a
24   pedestrian to see inside. (Carter Pl's SUF ¶ 35.) There are two
25   ways to enter the dispatch room: through the adjacent room, the
26   Disaster Operations Center ("DOC") door, or through the door that
27   leads into the hallway. (Cholakian Dep. 63:15-64:12.) The door that
28   leads into the DOC and the door from the dispatch room to the

hallway are both equipped with an OMNI lock system, which automatically lock outside of normal business hours. (Cholakian Dep. 65:1–17, 66:18–67:6; Carter Dep. 19:1–22.) Non-dispatcher County employees rarely enter the dispatch room, and when they do they typically knock to announce their presence before entering. (Mendoza Decl. ¶ 4; Cholakian Dep. 58:2–59:2, 69:1–10.)

While on duty in the dispatch room, Plaintiffs often worked long shifts alone and generally did not leave their post except for brief bathroom breaks. (Carter Dep. 24:11–25:11; e.g. Carter Decl. ¶ 6.) Plaintiffs were required to take their meal and rest breaks in the dispatch room. (Richards Dep. 85:21–86:5.) It was not uncommon during the "after hours" shifts for the entire building to be empty with the exception of the dispatcher on duty and the security personnel. (Cholakian Dep. 54:12–56:17.) The DWP furnished the employees with personal lockers in the dispatch room, as well as with a television, food cooking items, and storage items. (Carter Pl's SGI ¶ 58.) Plaintiffs engaged in a number of private acts in the dispatch room, which are not disputed. For example, Plaintiffs admit that on occasion in the dispatch room they changed into or out of work-out clothes, pumped breast milk, adjusted or undid their bras, applied deodorant, picked zits, removed or adjusted their sanitary napkins, picked their nose, stretched, cleaned body piercings, and engaged in other acts normally reserved for private spaces. (Carter Pls.' SUF ¶ 61.)

There is a dispute as to whether there was a sign in the public lobby by the main entrance of DPW Headquarters indicating that the building is under surveillance. (Carter Pl's SGI ¶ 68.) None of the cameras in the other areas of the building are hidden.

1 (Cholakian Dep. 76:11-15.) After a security incident in 2005, there
2 was discussion of installing security cameras in the dispatch room,
3 but at that time DWP decided against installing cameras. (Mendoza
4 Dep. 15:6-12; 17:1-19:9.) Plaintiffs state that it was their
5 understanding at that time that DWP decided not to install cameras
6 in the dispatch room to protect the employees' privacy. (See,
7 e.g., Mendoza Dep. 17:23-18:18, 22:21-23:10.) Plaintiffs were under
8 the impression cameras would never be installed in the dispatch
9 room. (Id.)

10      On December 10, 2008, Richards discovered that she was being
11 covertly videotaped at work.  She filed suit against Defendants.
12 At the same time, the Carter Plaintiffs, who had also been
13 subjected to covert video surveillance on the job, sued Defendants.
14 Collectively, the Carter and Richards Plaintiffs assert that
15 Defendants violated their Fourth Amendment right to be free from
16 unreasonable searches and seizures. (Compl. ¶ 30.) Plaintiffs also
17 bring suit under the California Constitution for a violation of
18 their privacy. (Id. ¶ 38.) On November 22, 2010, Defendants moved
19 for summary judgment.  On the same day, the Carter Plaintiffs and
20 Richards Plaintiffs each also for summary judgment.

21 **II. Legal Standards**

22      **A. Summary Judgment**

23      Summary judgment is appropriate where "the pleadings, the
24 discovery and disclosure materials on file, and any affidavits show
25 that there is no genuine issue as to any material fact and that the
26 movant is entitled to judgment as a matter of law."  Fed. R. Civ.
27 P. 56(c); see also Celotex Corp. v. Catrett, 477 U.S. 317, 324
28 (1986). In deciding a motion for summary judgment, the evidence is

viewed in the light most favorable to the non-moving party, and all justifiable inferences are to be drawn in its favor. Anderson v. Liberty Lobby, Inc., 477 U.S. 242, 255 (1986).

A genuine issue exists if "the evidence is such that a reasonable jury could return a verdict for the nonmoving party," and material facts are those "that might affect the outcome of the suit under the governing law." Id. at 248. No genuine issue of fact exists "[w]here the record taken as a whole could not lead a rational trier of fact to find for the non-moving party." Matsushita Elec. Indus. Co. v. Zenith Radio Corp., 475 U.S. 574, 587 (1986).

It is not enough for a party opposing summary judgment to "rest on mere allegations or denials of his pleadings." Anderson, 477 U.S. at 259. Instead, the nonmoving party must go beyond the pleadings to designate specific facts showing that there is a genuine issue for trial. Celotex, 477 U.S. at 325. The "mere existence of a scintilla of evidence" in support of the nonmoving party's claim is insufficient to defeat summary judgment. Anderson, 477 U.S. at 252. "Credibility determination, the weighing of the evidence, and the drawing of legitimate inferences from the facts are jury functions, not those of a judge [when he or she] is ruling on a motion for summary judgment." Id. at 255.

**III. Discussion**

All parties have moved this court for summary judgment and are in general agreement that the material facts in this case are not in dispute. Nonetheless, the court must as an initial matter consider whether summary judgment is appropriate here, or whether

the questions at issue in this case are ones that require further
factual development or might be better suited for resolution by a
jury.

Plaintiffs bring two claims: one for a violation of their
Fourth Amendment rights under the U.S. Constitution and one for a
violation of the California Constitution.  Resolution of
Plaintiffs' Fourth Amendment claim requires application of two
multi-factor tests set forth by the Supreme Court's plurality
opinion and Justice Scalia's concurring opinion in O'Connor v.
Ortega. 480 U.S. 709 (1987).  The court is sensitive to the fact
that, at their core, these tests each involve an assessment of the
reasonableness of the search in context.  As the plurality observed
in O'Conner, reasonableness is a fact-specific question that
involves weighing the character and scope of the search against any
expectation of privacy.  Id. at 728.  With such considerations in
mind, in O'Connor the Court held that the district court had erred
in granting petitioners summary judgment because there was a
dispute of fact "about the character of the search" and "no
findings were made as to the scope of the search."  Id.  The Court
remanded the case to the district court to evaluate "the
reasonableness of both the inception of the search and its scope."
Id.

Here, unlike in O'Connor, there is no dispute as to
circumstances leading to the inception of the search or the scope
of the search.  Furthermore, there is a well-developed factual
record, which clearly recounts the events surrounding DWP Assistant
Director Adams' investigation of Richards and related video

surveillance of the dispatch employees in the dispatch room.
Accordingly, the court concludes that the present dispute is an
appropriate candidate for summary judgment.

### A. Fourth Amendment claim

The Fourth Amendment protects the "right of people to be
secure in their persons, houses, papers, and effects, against
unreasonable searches and seizures . . . ."  U.S. Const. amend. IV.
It has long been established that "the Fourth Amendment protects
people, not places," Katz v. United States, 389 U.S. 347, 351
(1967), and that a person is protected by the Fourth Amendment when
he or she has "a subjective expectation of privacy and . . . the
expectation [is] one that society is prepared to recognize as
reasonable."  Id. at 361 (Harlan, J., concurring).

### 1.  O'Connor plurality test

In the employment context, a plurality of the Court in
O'Connor rejected the contention that "public employees can never
have a reasonable expectation of privacy in their place of work,"
and set forth a two-step framework for considering Fourth Amendment
claims against government employers.  480 U.S. at 717-19; 725-26.
First, a reviewing court must consider "[t]he operational realities
of the workplace" in order to determine "whether an employee has a
reasonable expectation of privacy" there.  Id. at 717.  Such
determination is made on "a case-by-case basis."  Id., at 718.
Next, where an employee has a legitimate privacy expectation, an
employer's intrusion on that expectation "for noninvestigatory,
work-related purposes, as well as for investigations of
work-related misconduct, should be judged by the standard of
reasonableness under all the circumstances."  Id. at 725-726.

1      Here, Plaintiffs undeniably manifested a belief that their
2  actions were executed in private: they performed various grooming,
3  cleaning, and changing acts reserved for private places.  See Bond
4  v. United States, 529 U.S. 334, 338 (2000); Taketa v. United
5  States, 923 F.2d 665, 670 (9th Cir. 1991).  After a review of the
6  facts and hearing oral argument, the court concludes that
7  Plaintiffs' belief that they were free from video surveillance was
8  reasonable.  See Minnesota v. Carter, 525 U.S. 83, 88 (1998)
9  ("[T]he extent to which the Fourth Amendment protects people may
10  depend upon where those people are.").

11      Plaintiffs worked in a secure, non-public, and often solitary
12  office.  While on duty, a dispatcher was required to take her meal
13  and rest breaks in the dispatch room.  An employee might, for
14  example, nap in the dispatch room during her break.  The fact that
15  the space was used not just for work, but also for resting, eating,
16  and napping is reflected in the room itself.  The dispatch room is
17  furnished with objects normally associated with activities reserved
18  for a home, not work, setting — e.g., a television and cooking
19  implements.  The presence of such objects in the dispatch room
20  office supports Plaintiffs' characterization of the room as a
21  "second home" and private. (Carter Pl's SGI ¶ 68.)

22      Defendants argue that the nature of the search was reasonable
23  because the dispatch room was not private; security and management
24  level supervisors had access to the room and, during regular
25  business hours, multiple employees shared the office. (Def's Mot.
26  7:27-8:1.)  The court is not persuaded by this argument.  While the
27  Court in O'Connor recognized that a government employee's office
28  could be "so open to fellow employees or the public that no

1    expectation of privacy [would be] reasonable," <u>O'Connor</u>, 480 U.S.

2    at 717–18, the dispatch room is not such a space.  The dispatch

3    room is a secured office separated from the rest of the DWP

4    building by restricted access doors.  It is not open to the public,

5    and it is not visible to the public or other employees from the

6    outside. (<u>See</u> Carter Pl's SUF ¶ 35; Carter Pl's SGI ¶ 35.) Nor does

7    the occasional entry of supervisors destroy a reasonable

8    expectation of privacy.  As the <u>O'Connor</u> plurality and Justice

9    Scalia agreed, "constitutional protection against *unreasonable*

10   searches by the government does not disappear merely because the

11   government has the right to make reasonable intrusions in its

12   capacity as employer."  <u>Id</u>. at 718 (internal quotation marks

13   omitted).  Or, put another way, "[p]rivacy does not require

14   solitude."  <u>Taketa</u>, 923 F.2d at 519 n.1.

15        In <u>Taketa</u>, the Ninth Circuit held that a government employee

16   had a reasonable expectation of privacy in his workplace office,

17   even though other employees had access to the office. <u>Id.</u> at 673.

18   In <u>Taketa</u>, the Ninth Circuit further held that an employee who was

19   videotaped while in another employee's office had "a reasonable

20   privacy expectation that he would not be videotaped [in the other

21   employee's office]." <u>Id</u>. at 677.  In that case, the Ninth Circuit

22   expressly based its holding "upon [its] recognition of the

23   exceptional intrusiveness of video surveillance." <u>Id</u>.  Similarly,

24   here, although different dispatchers staffed the room and

25   supervisors entered the room on occasion, the court concludes that

26   the Carter and Richards Plaintiffs had an objectively reasonable

27   expectation that they would not be surreptitiously videotaped.

28   <u>See, e.g.</u>, <u>Trujillo v. Ontario</u>, 428 F. Supp. 2d 1094, 1104 (C.D.

Cal. 2006) (holding that "Plaintiffs need not have an expectation of total privacy in order to have a reasonable expectation that they will not be recorded surreptitiously . . . .").

The court notes that the facts in this case in support of Plaintiffs' reasonable expectation of privacy in the dispatch room are compelling.  The court, therefore, finds it important to make clear that its determination that Plaintiffs' had a reasonable expectation of privacy in the dispatch room does not depend on the fact that the dispatch room had locked doors or that employees occasional worked alone.  Absent the aforementioned — and unusual — workplace scenario where a government employee's office is so open to others that no expectation of privacy would be reasonable, an employee has a Constitutionally protected right to privacy in the workplace.  O'Connor, 480 U.S. at 718.  This right undeniably extends to shared offices.  See, e.g, Id. at 731 (explaining that a "government secretary working in an office frequently entered by other government employees," retains her Constitutional protection against unreasonable searches by the government) (Scalia, J., concurring).

Next, the court considers the second factor under the O'Connor plurality test, i.e., the reasonableness of the search.  Under the plurality's test, a search is reasonable if: (1) it is justified at its inception; (2) the measures adopted are reasonably related to the objectives of the search; and (3) the measures adopted are not excessively intrusive in light of the circumstances giving rise to the search.  Id. at 725–26.

1    As a general matter, a government employer is permitted to
2   conduct an internal disciplinary investigation of a government
3   employee where there is individualized suspicion. <u>See</u> <u>id.</u> at 726.
4   The Carter Plaintiffs, however, were subject to video recording
5   because of an anonymous complaint against Richards — a complaint
6   which in no way implicated them. (Carter Pl's SUF ¶ 70.)   DWP
7   Assistant Director Chuck Adams made no effort to limit the hours or
8   individuals he covertly recorded. (Adams Dep. 120:4-9); <u>Compare</u>
9   <u>City of Ontario, Cal. v. Quon</u>, 130 S. Ct. 2619, 2633 (2010)
10  (holding that the police department conducted a reasonable
11  investigation when it reviewed an officer's text messages where the
12  government limited the search to a sample of the messages and
13  redacted all messages sent while off duty).   Furthermore, Thomas
14  directed Celles to check the videotape for any wrongdoing by any of
15  the dispatchers, and Celles admits to watching other employees on
16  the tapes. (Thomas Dep. 33:1-23; Celles Dep. 198:19-199:2.)
17  Plaintiffs were watched unknowingly as they performed acts they
18  never would have performed in public. Defendants' video
19  surveillance of the Carter Plaintiffs lacked justification at the
20  inception of the search.

21    At the risk of stating the obvious, employers can investigate
22  allegations of employee misconduct.   Employers have many
23  traditional tools available in that regard.   Covert video
24  surveillance is not a traditional tool.   We pride ourselves on our
25  respect for individual privacy.   Outside of a strip search or a
26  body cavity search, a covert video search is the most intrusive
27  method of investigation a government employer could select.   Secret
28  videotaping goes against the grain of our strong anti-Orwellian

traditions.  Secret videotaping should be reserved for those extreme and rare circumstances involving serious transgressions where it is highly improbable that less odious techniques will be effective.  The intrusiveness of the search must be commensurate with the seriousness of the suspected misconduct.  Although some investigation into Richards alleged misconduct may certainly have been appropriate, the court concludes that a secret video surveillance search was excessively intrusive.  The status of being an employee does not carry with it the elimination of personal dignity.

    The court is not alone in recognizing the severity of covert video surveillance.  See, e.g., United States v. Koyomejian, 970 F.2d 536, 551 (9th Cir. 1992) (Kozinski, J., concurring) ([E]very court considering the issue has noted [that] video surveillance can result in extraordinarily serious intrusions into personal privacy.”); Taketa, 923 F.2d at 677 (finding a fourth amendment violated in part on the bases of the “exceptional intrusiveness of video surveillance”); United States v. Torres, 751 F.2d 875, 882 (7th Cir. 1984) (“We think it . . . unarguable that television surveillance is exceedingly intrusive.”); United States v. Falls, 34 F.3d 674, 680 (8th Cir. 1994) (“It is clear that silent video surveillance results . . . in a very serious, some say Orwellian, invasion of privacy.”); United States v. Mesa-Rincon, 911 F.2d 1433, 1443 (10th Cir. 1990) (“Because of the invasive nature of video surveillance, the government's showing of necessity must be very high to justify its use.”); United States v. Cuevas-Sanchez, 821 F.2d 248, 251 (5th Cir. 1987) (“[I]ndiscriminate video surveillance raises the specter of the Orwellian state.”).

1    Here, DWP Assistant Director Chuck Adams knew that the
2    allegation was that Richards was engaging in sexual activities in
3    the dispatch room at night, and that, if substantiated, he was
4    likely to capture her on film without her knowledge.  Although the
5    court is mindful that an employer is not limited to employing the
6    least intrusive search practicable, the court notes that here
7    several alternatives existed through which DWP's search could have
8    been limited, including only video recording Richards when she
9    worked alone, checking the guest logs for unauthorized visitors,
10   videotaping the door to the dispatch room to monitor entry to the
11   dispatch room, or interviewing Richards' co-workers.  Furthermore,
12   unlike in the Supreme Court's recent case, Quon, the employees here
13   were never specifically told that their office could be subject to
14   review in this fashion.  Quon, 130 S. Ct. at 2631. (See also Adams
15   Dep. 117:7-20.)

16   For the reasons explained above, the court concludes that
17   under the circumstances the inception and the scope of the
18   intrusion the Carter and Richards Plaintiffs were subjected to was
19   not reasonable.  Under the O'Connor plurality test, Plaintiffs
20   Fourth Amendment rights were violated.

21              **2.  Scalia's concurrence test**
22
23   The second test from O'Connor to determine whether a
24   government employer has violated the Fourth Amendment rights of an
25   employee is provided by Justice Scalia's concurrence.  Under this
26   test, the court asks if the government's search would be "regarded
27   as reasonable and normal in the private-employer context."
28   O'Connor, 480 U.S. at 732 (Scalia, J., concurring).

1      In the private sector, the Carter and Richards Plaintiffs
2  could sue for the common law tort of intrusion.  In California, a
3  privacy violation based on the common law tort of intrusion has two
4  elements.  First, the Defendant must "intentionally intrude into a
5  place . . . or matter as to which the plaintiff has a reasonable
6  expectation of privacy," and, second, "the intrusion must occur in
7  a manner highly offensive to a reasonable person."  Hernandez v.
8  Hillsides, Inc., 211 P.3d 1063, 1072-73 (Cal. 2009).

9      Resolution of this question is, in large part, redundant of
10 the previous discussion.  For the reasons set forth above, the
11 court concludes that Plaintiffs had a reasonable expectation of
12 privacy in the dispatch room.

13      A comparison with the California Supreme Court case of
14 Hernandez, which also involved covert video surveillance, is
15 instructive.  In Hernandez, the Court held that a private employer
16 violated its employees' reasonable privacy expectation when it
17 placed a hidden video camera inside the employees' semi-private
18 office.  Id. at 1075.  The Hernandez court explained that
19 "employees who retreat into a shared or solo office, and who
20 perform work or personal activities in relative seclusion there,
21 would not reasonably expect to be the subject of . . . secret
22 filming by their employer."  Id. at 1076.  Just as the employees in
23 Hernandez had no reasonable expectation that their employer would
24 intrude "so tangibly into their semi-private office," id. at 1078,
25 the dispatch workers here reasonably believed that their restricted
26 area, equipped with both personal and work space, was also at least
27 semiprivate.  Id. at 292.

28

Next, the court notes once again that the intrusion here was
by way of hidden video camera.  Secret video surveillance is one of
the most intrusive methods of search, and video surveillance of the
Carter and Richards Plaintiffs was "highly offensive to a
reasonable person." Id. at 286.

In sum, the court concludes that because of the constant and
non-discriminating nature of the surveillance, and because it
occurred in a semi-private area where employees had to perform non-
work activities (like eating and taking breaks), under either
Justice Scalia's O'Connor test or the O'Connor plurality test, the
video surveillance was unreasonable and in violation of the Carter
Plaintiffs' and Richards Plaintiffs' Fourth Amendment rights.
Plaintiffs are entitled to a judgment as a matter of law on this
claim.  See Fed. R. Civ. P. 56(c).

### 2.  Monell liability

Neither the Carter nor Richards Plaintiffs bring suit against
individual named defendants.  Rather, Plaintiffs sue two municipal
entities.  In Monell v. Department of Social Services of the City
of New York, 436 U.S. 658 (1978), the Supreme Court held that a
municipality is subject to suit under § 1983 only if the alleged
constitutional deprivation resulted from a city custom or policy.
In practice, this means that in order to hold Los Angeles County or
the DWP liable for a Fourth Amendment violation under § 1983,
Plaintiffs must establish that the alleged constitutional violation
was (1) committed pursuant to a formal government policy,
longstanding practice, or standard operating procedure, (2)
committed by an official with final policy-making authority, or (3)
ratified by an official with final policy-making authority.  See

16

1   <u>City of St. Louis v. Praprotnik</u>, 485 U.S. 112, 126-27 (1988); <u>see</u>

2   <u>also</u> <u>Board of County Commissioners v. Brown</u>, 520 U.S. 397, 409

3   (1997) (explaining that "evidence of a single violation of federal

4   rights, accompanied by a showing that a municipality has failed to

5   train its employees . . . could trigger municipal liability").

6       Here, Plaintiffs argue all of the above.  According to

7   Plaintiffs: the DWP has a policy or longstanding custom of using

8   covert surveillance to monitor its employees; DWP Director Dean

9   Efstathiou authorized the surveillance in the present instance and

10  is an official with final policy-making authority; and the County

11  of Los Angeles failed to adequately train its employees with regard

12  to surveillance.  (<u>See</u> Carter Pl.'s Opp'n 15-19.)  Defendants

13  challenge each of these arguments.  (<u>See</u> Def.'s Opp'n 11:19-26.)

14      As noted above, the factual record is well developed with

15  respect to the nature, context, and scope of the video search.  The

16  record, however, is not equally developed with respect to <u>Monell</u>

17  liability.  Neither Defendants nor Plaintiffs have satisfied their

18  initial burden of showing that there are no genuine issues of

19  material fact concerning Plaintiffs' <u>Monell</u> claim.  Accordingly,

20  the court bifurcates resolution of Plaintiffs' Fourth Amendment

21  claim and Plaintiffs' <u>Monell</u> claim and denies Plaintiffs' motions

22  and Defendants' motion for summary judgment on Plaintiffs' <u>Monell</u>

23  claim.  <u>See</u> <u>Berry v. Baca</u>, 379 F.3d 764, 769 (9th Cir. 2004)

24  (noting that "[w]hether a local government has displayed a policy

25  of deliberate indifference to the constitutional rights of its

26  citizens is generally a jury question") (internal quotation marks

27  omitted); <u>Green v. Baca</u>, 226 F.R.D. 624, 632 (C.D. Cal. 2005)

28

(bifurcating a § 1983 trial in order to "separate the question[]
regarding the . . . city's liability under <u>Monell</u>").

**B. California Constitution claim**

The Carter and Richards Plaintiffs further allege that
Defendants violated their privacy rights under Article I, section 1
of the California Constitution.  In <u>Hernandez</u>, the California
Supreme Court recently articulated the factors a plaintiff claiming
a privacy violation under the California Constitution must allege:
(1) a legally protected privacy interest, (2) a reasonable
expectation of privacy in the circumstances, and (3) an intrusion
so serious in nature, scope, and actual or potential impact as to
constitute an egregious breach of social norms.  <u>Hernandez</u>, 211
P.3d at 1073.

A legally protected privacy interests is generally manifest
where one would expect to conduct "personal activities without
observation, intrusion, or interference, as determined by
'established social norms' . . . ." <u>Id.</u>  The grooming and other
personal acts engaged in by the Carter and Richards Plaintiffs
clearly meet this standard. (Carter Pls' SUF ¶ 61.)

Next, in assessing the reasonableness of Plaintiffs'
expectations under California law, "customs, practices, and
physical settings surrounding particular activities may create or
inhibit reasonable expectations of privacy."  <u>Hill v. Nat'l
Collegiate Athletic Ass'n</u>, 865 P.2d 633, 655 (Cal. 1994).  In
<u>Hernandez</u>, the California Supreme Court noted that Plaintiffs
worked in an office space with a door that could be locked, with
blinds that could be drawn, and that they "may perform grooming or
hygiene activities or conduct personal conversations, during the

18

workday." 211 P.3d at 1076. Similarly, in the instant case, the
dispatch room door remained closed during regular business hours,
non-dispatcher employees would typically knock before entering, and
no one could see into the dispatch room. (Cholakian Dep.
52:24–53:6; 58:2–59:2, 69:1–10.) Furthermore, after regular
business hours, it was not uncommon for Plaintiffs to work alone in
the room. (Carter Dep. 19:1–22.) Defendants once again argue that
multiple individuals shared and had access to the room, upsetting
any reasonable expectation of privacy. Just as in the federal
context, the California Supreme Court has recognized that privacy
is not an "all-or-nothing characteristic," and "the fact that the
privacy one expects in a given setting is not complete or absolute
does not render the expectation unreasonable." Hernandez, 211 P.3d
at 1074 (citing Sanders v. American Broadcasting Cos., 978 P.2d 67,
72 (Cal. 1999)). The court concludes that under California law,
the Plaintiffs had a reasonable expectation of privacy in the
dispatch room.

     Finally, in assessing whether the surveillance is a
sufficiently serious intrusion as to constitute an egregious breach
of social norms, California courts have analyzed the surrounding
circumstances, the degree and setting of the intrusion, the motives
and objectives of the intruder, and whether less intrusive means
would have sufficed. Hernandez, 211 P.2d at 1079. The court in
Hernandez found the videotaping not offensive because the scope of
the videotaping was limited to only three instances after work
hours, the defendant in that case removed the camera after three
weeks, and the Plaintiffs were never captured on camera. Id. In
contrast, Plaintiffs in the instant case were recorded while they

1  unknowingly performed private acts, the surveillance was constant,

2  and it continued even after the stated objective was complete.

3  Furthermore, Thomas instructed Celles to monitor all of the

4  employees, not just Richards.   Finally, as discussed previously,

5  several less intrusive methods were available to Defendants in

6  investigating the allegations against employee Richards.   Thus,

7  Defendants violated Plaintiffs' right to privacy under the

8  California Constitution.

9       For the foregoing reasons, the court grants Plaintiffs motion

10  for summary judgment on this claim.

11  **IV. Conclusion**

12       For the forgoing reasons, the court DENIES Defendants' motion

13  for summary judgment and GRANTS in part and DENIES in part the

14  Carter Plaintiffs' and Richards' Plaintiffs' motions for summary

15  judgment.

16

17  IT IS SO ORDERED.

18

19

20  Dated: February 22, 2011

21                                        DEAN D. PREGERSON
                                          United States District Judge

22

23

24

25

26

27

28